## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

```
ROGER LATTA and JACQUELINE      )
LATTA,                          )
                                )
Plaintiffs,                     )
                                )
vs.                             )    NO. 2:03-CV-41
                                )
WALTER CHAPALA, et al.,         )
                                )
Defendants.                     )
```

### ORDER

This matter is before the Court on the State Defendants' Motion for Summary Judgment [DE #192], filed by Defendants, Walter Chapala, Scott Duerring, the LaPorte County Prosecutor's Office, Arland Boyd, the Indiana State Police, Bradley Sandberg, and the Indiana State Fire Marshal's Office (hereinafter the "State Defendants"), on June 16, 2005.  For the reasons set forth below, the motion is **GRANTED**.  The Clerk is **ORDERED** to **DISMISS WITH PREJUDICE** Plaintiffs' claims against Defendants, Walter Chapala, Scott Duerring, the LaPorte County Prosecutor's Office, Arland Boyd, the Indiana State Police, Bradley Sandberg, and the Indiana State Fire Marshal's Office.


BACKGROUND

Three other motions for summary judgment have been filed by various other defendants in this case.  This order solely analyzes the

instant motion for summary judgment filed by the State Defendants.

Plaintiffs' 42 U.S.C. section 1983 claim stems from a fire that occurred on February 14, 1989, in which their two-year-old son died. Plaintiffs allege that the State Defendants violated their constitutional rights.  This Court assumes the reader's familiarity with the general facts of this case, as set forth in this Court's order dated October 25, 2005, granting the Michigan City Defendants' motion for summary judgment.

Defendants, Scott Duerring and Walter Chapala, were prosecutors for the LaPorte County Prosecutor's Office.  (Sec. Am. Compl. ¶ 8.) Defendant, Arland Boyd, was a police officer for the Indiana State Police.  (Sec. Am. Compl. ¶ 7.)  Defendant, Bradley Sandberg, was a Deputy State Fire Marshal for the Indiana State Fire Marshal's Office. (Sec. Am. Compl. ¶ 9.)

<u>Chapala</u>

When Chapala was prosecutor for LaPorte County, the LaPorte County Homicide Unit was established sometime prior to November, 1980. (Pls.' Ex. 14, Correspondence dated Nov. 13, 1980, from Chapala to the members of the LaPorte County Council.)  In 1985, the possibility of forming an arson task force was discussed in the prosecutor's office monthly staff meeting.  (Pls.' Ex. 2, Monthly Staff Meeting of April 10, 1985.)  The meeting minute notes state that "unbeknownst to Skip (Chapala) there exists a bit of animosity between firemen and

policemen when it comes to arson investigations." (*Id.*) By September of 1988, the Arson Task Force was finally ready to be called out in situations where arson may be suspected. (Pls.' Ex. 11, Monthly Staff Meeting of September 7, 1988.) It is undisputed that the Arson Task Force was not called to investigate the Latta fire.

Chapala was on the scene of the Latta house fire the morning after the fire. (Chapala Dep., pp. 55-57.) Based upon what he believed to be burn patterns on the floor, Chapala decided the fire was arson. (*Id.*, p. 58.) During his deposition, Chapala stated that he had decided the case was an obvious arson even before the fire had stopped smoking. (*Id.*, pp. 55-56.) Chapala admits that he never received any arson training. (*Id.*, p. 58.) However, according to Chapala, it was the LaPorte County Sheriff's Department's responsibility to conduct the investigation of the Latta fire, not the Prosecutor's Office. (*Id.*, pp. 69-70.)

Plaintiffs claim that Chapala's bias or rush to judgment seriously compromised a fair and full investigation of the Latta house fire. When questioned about his role, Chapala testified that he participated in the investigation, and they:

> worked as a team. We met often and conversed often, and discussed things often . . . drew from the expertise of everyone that was there. And that was the whole idea of the team concept. As far as me bringing the team together, yes, I was responsible for that. But as far as how the team operated within their parameters, it was more of a group decision, meaning which way should we focus.

(*Id.*, p. 67.)

Chapala made the ultimate decision to file the charges in this case.  (*Id.*, p. 84.)  He was not involved in the trial.  (*Id.*, p. 83.)  Rather, the prosecution was handled by Duerring after the charges were brought.  (*Id.*, p. 82.)

Duerring

Duerring, a former partner of Chapala, went to the scene the morning after the fire, on February 15, 1989.  (Duerring Dep., pp. 48-49.)  Mollenhauer (a fire investigator with the LaPorte County Sheriff's Department), and Sandberg walked through the premises with Duerring and pointed out "things that they were very suspicious about," including the burn patterns on the floor.  (*Id.*, pp. 51-53.)  At the time, Duerring had never handled an arson case by himself in his career, although he believes he had previously helped Chapala with a couple of arson cases.  (*Id.*, p. 52.)

After the Lattas were charged, Duerring enlisted the services of John Walker from Barker and Herbert Labs to critique the opinions of the Defendants' expert.  (Pls.' Ex. 36, October 17, 1989 correspondence from Duerring to Walker.)  During a hearing on the Lattas' motion to suppress and at the criminal trial, Walker testified he had been hired by Auto Owner's Insurance Company to investigate the case; Walker denied he had been hired by the LaPorte County Prosecutor's Office to do the investigation.  (Pls.' Ex. 38, trial

-4-

testimony of Walker, pp. 580-91, 708, 712, 890.)  Plaintiffs contend Walker worked for the LaPorte County Prosecutor's office, although this is unclear than clear from Walker's testimony.

The Latta's defense attorney served a subpoena upon Barker & Herbert Labs requesting certain information about the tests conducted on fire debris samples taken from the Latta house.  In response to the subpoena, Barker & Herbert Labs only described the chromatograms in writing.  (Pls.' Ex. 51.)  Plaintiffs claim the lab did not turn over the actual chromatograms  pursuant to Duerring's instruction (Pls.' Ex. 57), but the record does not clearly indicate that Duerring actually instructed the lab not to turn over the chromatograms, nor does the subpoena specifically request the actual chromatograms.  The prosecution did not turn over the actual chromatograms or reference standards prior to or during trial.  Duerring believed the chromatograms were inculpatory, not exculpatory. (Duerring Dep., pp. 177-78.)  Plaintiffs believe the chromatograms were critical evidence and are exculpatory.

<u>Sandberg</u>

Sandberg was a Deputy State Fire Marshall for the Indiana State Fire Marshall's Office.  He participated in the team approach to the cause and origin investigation.  (Sandberg Dep., p. 83.)  After inspecting the interior and exterior of the house, Sandberg ruled out the furnace and the space heater as a cause of the fire.  (*Id.*, pp.

35-36, 48, 51, 56-57, 126.)   Sandberg concluded that physical indicators, including the floor burn patterns, and the elimination of accidental causes, led him to believe that the fire was arson. (*Id.*, pp. 87-88.)   Plaintiffs criticize Sandberg for not tagging into evidence or taking any photographs of the space heater. Additionally, Plaintiffs criticize Sandberg's testimony at trial, based on only one day's investigation.

Boyd

In February 1989, Boyd was a police officer with the Indiana State Police.   He responded to the scene as a member of the LaPorte County Homicide Unit on February 15, 1989. (Boyd Dep., pp. 60-61, 80.)  The day after the fire, on February 16, 1989, Boyd interviewed Roger Latta.   According to Roger Latta, Boyd was physical in conducting his interrogation, but Roger Latta never made any admissions or implicated himself with the fire. (*Id.*, p. 127.)  Boyd then left Roger Latta's interview, went upstairs, and interviewed Jacqueline Latta. (*Id.*, p. 125.)

Jacqueline Latta told him she had taken tranquilizers, and she appeared to be upset. (Boyd Dep., pp. 129-33.)   Yet she seemed coherent and rational during the interview. (*Id.*, p. 130.)   The interview, or interrogation, lasted approximately one hour. (*Id.*, p. 159.)   According to Boyd, Jacqueline denied her involvement with the fire numerous times, but she also made several statements he

-6-

considered to be admissions of guilt.  (*Id.*, pp. 158-60.)  Jacqueline stated "I must have set the fire, but where did I start it at?" (Pls.' Ex. 24, Boyd's Supp. Report, p. 4.)  She also said that if she had burned the house she was sorry, and she was sorry that Brad died, and that she had set the fire because she was angry.  (*Id.*)  Jacqueline Latta asked Boyd several times if he thought she needed an attorney, but when Boyd responded they would have to terminate the interview if she wanted an attorney, she then grasped Boyd by the arms and told him she did not want Boyd to go and did not want an attorney.  (*Id.*, p. 6.)

Plaintiffs criticize Boyd for using deceptive police trickery including techniques he learned at the Reid School of Interrogation.  Additionally, Plaintiffs argue that Jacqueline Latta's interview should have been recorded.  At trial, Boyd testified that when he started the interview with Roger Latta on February 15, 1989, he advised Roger Latta of his *Miranda* rights because Boyd considered both Roger and Jacqueline Latta to be suspects in the crime of arson and the death of their child.  (Boyd Trial Test., p. 1617.)

Plaintiffs claim that in violation of section 1983, the State Defendants violated the Lattas' Fourth, Fifth, Sixth and Fourteenth Amendment rights, including the due process clause, by deliberately withholding exculpatory evidence, conspiring to wrongfully convict the Lattas, failing to fully and fairly investigate the manner, and failing to record Boyd's interrogation of Jacqueline Latta and falsely

reporting that she had made incriminating statements, all which deprived Plaintiffs of their right to receive a fair trial that resulted in their wrongful conviction and imprisonment.  (Sec. Am. Compl. Counts I, III, IV.)


DISCUSSION

The standards that generally govern summary judgment motions are familiar.  Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In other words, the record must reveal that no reasonable jury could find for the nonmovant.  *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).  In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmovant.  *Anderson*, 477 U.S. at 255; *NUCOR Corp. v. Aceros Y Maquilas De Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

The burden is upon the movant to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the movant believes "demonstrate the absence of a genuine issue of material fact."

-8-

*Celotex*, 477 U.S. at 323.  Once the movant has met this burden, the nonmovant may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989).  "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might affect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) (emphasis in original) (citing *Anderson*, 477 U.S. at 248).

"[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988) (emphasis in original); *see also Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 (7th Cir. 1993). Therefore, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment will be appropriate.  In this situation, there can be "'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

To state a claim under section 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted); *see also Cunningham v. Southlake Ctr. for Mental Health*, 924 F.2d 106, 107 (7th Cir. 1991). The preliminary step in any section 1983 claim is to determine which of Plaintiffs' substantive constitutional rights were allegedly violated. *Spiegel v. Rabinovitz*, 121 F.3d 251, 254 (7th Cir. 1997).

<u>Eleventh Amendment Immunity</u>

The State Defendants argue that the section 1983 claims for damages against the state agencies and the individual defendants in their official capacities are barred by sovereign immunity. Plaintiffs fail to even address this argument or any of the case law cited by the State Defendants.

The State Defendants are correct that the Eleventh Amendment deprives the federal courts of subject matter jurisdiction to entertain claims against a State. *See Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 60 ("[W]e have long held that the Eleventh Amendment bars suits against States and state entities regardless of the nature of relief requested."); *see also Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996) (ruling under the Eleventh

-10-

Amendment, each State in our federal system remains a sovereign entity and may not be sued by an individual without its consent); *Scott v. O'Grady*, 975 F.2d 366, 369 (7th Cir. 1992) (citations omitted)("All suits against a state or its agencies are barred by the Eleventh Amendment unless the state consents to suit in federal court or Congress uses its powers under the Fourteenth Amendment to abrogate the state's Eleventh Amendment immunity.").  In this case, there is no evidence that the State Defendants have consented to suit.

The immunity conferred on a state by the Eleventh Amendment extends to state agencies as well.  *See, e.g., Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993); *Higgins v. Mississippi*, 217 F.3d 951, 953 (7th Cir. 2000); *Kashani v. Purdue Univ.*, 813 F.2d 843, 845 (7th Cir. 1987).  It is undisputed in this case that the Indiana State Police Department, the Indiana State Fire Marshal's Office, and the LaPorte County Prosecutor's Office, are all agencies of the state of Indiana.[1]  Therefore, Plaintiffs' claims against these Defendants are barred by the Eleventh Amendment.

The Eleventh Amendment bar extends to suits for money damages

---

[1]With regard to the LaPorte County Prosecutor's Office, courts have found that because the office of prosecutor is a creation of the Indiana Constitution, *see* Ind. Const. art. 7, § 16, and state statutes govern the prosecutor's duties and powers, prosecutors are protected by Eleventh Amendment immunity. *Srivastava v. Newman*, 2001 WL 338110, at *2 (7th Cir. Mar. 30, 2001); *see also Bibbs v. Newman*, 997 F. Supp. 1174, 1181 (S.D. Ind. 1998) (finding prosecutors are state officials when prosecuting criminal cases); *Study v. United States*, 782 F. Supp. 1293, 1297 (S.D. Ind. 1991) (same).

against state officials sued in their official capacities, because "a judgment against a public official 'in his official capacity' imposes liability on the entity that he represents." *MSA Realty Corp. v. State of Illinois*, 990 F.2d 288, 291 (7th Cir. 1993) (quoting *Brandon v. Holt*, 469 U.S. 464 (1985)); *see also Edelman v. Jordan*, 415 U.S. 651, 663 (1974). Consequently, Defendants, Chapala, in his official capacity as LaPorte County Prosecutor, Duerring, in his official capacity as Deputy Prosecutor for LaPorte County Prosecutor's Office, Boyd, in his official capacity as Police Officer for the Indiana State Police, and Sandberg, in his official capacity as Deputy State Fire Marshall, are immune from Plaintiffs' claims for monetary damages under section 1983.

The Court notes that it "may exercise jurisdiction over suits alleging violations of federal constitutional or statutory law that are brought against state officials in their personal capacities." *MSA Realty Corp.*, 990 F.2d at 291 (citing *Ex parte Young*, 209 U.S. 123 (1908)). Thus, the Court does have jurisdiction over Chapala, Duerring, Boyd, and Sandberg for the claims against them in their individual capacities.

In sum, all of Plaintiffs' claims against the State Defendants, LaPorte County Prosecutor's Office, the Indiana State Police Department, the Indiana State Fire Marshal's Office and the official capacity claims against Chapala, Duerring, Boyd, and Sandberg, are dismissed for lack of subject matter jurisdiction.

-12-

Persons Under 1983

Even if the Eleventh Amendment immunity did not constitute an absolute bar to Plaintiffs' claims against the state agency defendants and the individual defendants in their official capacity, the State Defendants argue that the claims still fail because Plaintiffs cannot sue these defendants for damages in a civil rights action under section 1983. Plaintiffs do not contest this argument, but rather argue that their claims against the individual defendants in their personal capacities should survive.

The United States Supreme Court has held that neither states nor state officials acting in their official capacities are "persons" within the meaning of section 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Therefore, this suit is not authorized by federal statute as to the claims against the LaPorte County Prosecutor's Office, the Indiana State Police Department, the Indiana State Fire Marshal's Office and the official capacity claims against Chapala, Duerring, Boyd, and Sandberg.

However, as cited by Plaintiffs:

> The states' immunity from federal suit does not extend to their officials sued for violations of federal law; illegal actions by state officials are not the acts of the state and do not share in its immunity. The state official who acts in violation of the federal Constitution is stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct.

*MSA Realty Corp.*, 990 F.2d at 291 (quotation and citation omitted).

-13-

Thus, the claims against Chapala, Duerring, Boyd, and Sandberg in their individual capacities do survive.


Statute of Limitations

The State Defendants assert that any of Plaintiffs' claims relating to Jacqueline Latta's allegedly coerced confession during her interrogation by Boyd are barred by the applicable two-year statute of limitations. Plaintiffs do not directly address this argument, but rather argue in response that they did not know about Defendants' conspiracy to wrongfully convict the Lattas until discovery took place in this litigation. Plaintiffs also assert that the statute of limitations was tolled by *Heck v. Humphrey*, 512 U.S. 477 (1994).

Indiana's two-year statute of limitations for personal injury actions applies to claims brought under section 1983. *See Brademas v. Indiana Hous. Fin. Auth.*, 354 F.3d 681, 685 (7th Cir. 2004) ("Claims brought under § 1983 are subject to the statute of limitations for personal injury claims of the state where the alleged injury occurred."); Ind. Code § 34-11-2-4 (providing that an action for injury to person, character, or property must be commenced within two years after the cause of action accrues). The issue here is when the limitations period began to run.

While state law determines the applicable statute of limitations period, "[f]ederal law determines when a claim accrues. A § 1983 claim accrues when the plaintiff knows or has reason to know of the

-14-

injury which is the basis of his action." *Brademas*, 354 F.3d at 685 (quoting *Hondo, Inc. v. Sterling*, 21 F.3d 775, 778 (7th Cir. 1994)); *see also Kelly v. City of Chicago*, 4 F.3d 509, 511 (7th Cir. 1993).

Plaintiffs claim that *Heck* tolls the statute of limitations relating to their conspiracy claim.  In *Heck*, the Supreme Court set forth an accrual rule, holding that a damages claim that "would necessarily imply the invalidity of [a] conviction or sentence" may not be brought so long as the conviction stands.  *Heck*, 512 U.S. at 487.  In pertinent part, the *Heck* Court held that:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment . . . a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.  A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983.  Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the Plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.  But, if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

*Id*. at 486-87.

In other words, a plaintiff seeking damages for an allegedly

-15-

unconstitutional conviction or imprisonment, or for other harms stemming from unlawful actions that would render a conviction or sentence invalid, has no section 1983 cause of action until the conviction or sentence is reversed, expunged, invalidated, or impugned by the grant of a writ of habeas corpus. If a judgment for the plaintiff "would necessarily imply the invalidity of his conviction or sentence," the plaintiff's section 1983 cause of action does not arise, and the statute of limitations does not begin to run, until the plaintiff's conviction has been invalidated. *Id.* at 487. However, if "the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff," his section 1983 cause of action arises, and the statute of limitations begins to run, when the plaintiff knew or should have known that his constitutional rights were violated. *Id.* (emphasis in original.) In *Heck*, the Court stated an example of a section 1983 suit that should be allowed to proceed are suits for damages for allegedly unreasonable searches. *Id.* at 487 n.7. Because of doctrines such as independent source, inevitable discovery, and harmless error, such an action, even it successful, would not necessarily imply that the plaintiff's conviction was unlawful. *Id*. Thus, the issue is whether, now that Plaintiffs' convictions have been set aside, their claims accrued after the convictions were invalidated, or when Plaintiffs knew or should have known of the violations.

-16-

The State Defendants argue that Plaintiffs' claim regarding the voluntariness of Jacqueline Latta's statements is barred by the 2-year statute of limitations. Specifically, the State Defendants claim that Plaintiffs knew about the alleged involuntary confession at the time of the confession in 1989, therefore the suit was untimely filed more than a decade later.

As noted by Defendants, courts have held that the harmless error doctrine applies to coerced confessions. *See Arizona v. Fulminante*, 499 U.S. 279, 310-11 (1991); *Simmons v. O'Brien*, 77 F.3d 1093,1095 (8th Cir. 1996)(holding "[b]ecause harmless error analysis is applicable to the admission at trial of coerced confessions, judgment in favor of [plaintiff] on this § 1983 action will not necessarily demonstrate the invalidity of his conviction . . . thus [plaintiff's] cause of action has accrued."). The Seventh Circuit has previously found that such a claim is not necessarily barred by *Heck*, but subject to the 2-year limitations period. *See O'Neill v. Burks*, No. 00-3269, 2001 WL 693848, at *1 (7th Cir. June 18, 2001) (finding defendant was required to bring claim of coerced confession immediately because the harmless error analysis is applicable, and judgment in favor of defendant on the section 1983 claim would not necessarily invalidate the conviction). Thus, "the limitations period is not automatically tolled in every case when an involuntary confession was used to obtain a conviction." *Howard v. City of Chicago*, No. 03 C 8481, 2004 WL 2397281, at *6 (N.D. Ill. Oct. 25, 2004) (citing *Simmons*, 77 F.3d at

1095).

However, some cases have concluded that claims of an involuntary confession do imply the invalidity of a conviction (and therefore toll the limitations period), when the violation yielded a confession that directly led to a conviction. *See, e.g., Johnson v. Village of Riverdale*, 192 F. Supp. 2d 874, 876 (N.D. Ill. 2002). In *Johnson*, the coerced confession was the only evidence implicating plaintiff. *Id.* at 876. Therefore, the *Johnson* court found that the 1983 action contesting the confession, if successful, would necessarily have implied the invalidity of the conviction based solely on that confession. *Id.* Similarly, in *Howard*, the court found that because the defendant's conviction rested almost entirely on his involuntary confession, defendant could not have challenged the defendants' actions of fabricating his confession without necessarily implying the invalidity of his conviction. *Howard*, 2004 WL 2397281, at *7.

On the other hand, if the conviction was not solely based on the allegedly coerced confession, courts have found that actions are not collateral attacks on the conviction, and the claim accrues when the alleged coercion took place. *See Wiley v. City of Chicago*, 361 F.3d 994, 996-98 (7th Cir. 2004); *Hobley v. Burge*, No. 03 C 3678, 2004 WL 1243929, at *5 (N.D. Ill. June 3, 2004) ("[C]ourts presented with allegations such as torture ordinarily conclude that such claims would have been actionable immediately because success on the claim generally is not incompatible with a subsequent conviction.").

-18-

In this case, Plaintiffs fail to address whether the claims regarding the alleged coerced statements of Jacqueline Latta to Boyd are time barred.  However, as this Court found in its October 25, 2005, order granting summary judgment in favor of the Michigan City Defendants, other evidence was introduced at trial aside from Jacqueline Latta's statements, including, but not limited to testimony about the presence of an accelerant and expert testimony indicated that the fire was intentionally set.  Plaintiffs themselves admit that Barker & Herbert's finding of an accelerant which allegedly matched the container of Lady Lee charcoal lighter fluid found in the Latta's house was a piece of evidence used to convict the Lattas.  (Pls.' Mem. of Law in Opp. to State Defs.' Mot. for Summ. J., p. 69.)  Again, this Court finds that because the Lattas' convictions were based, at least in part, upon this contributing evidence, the Plaintiffs' claim relating to Jacqueline Latta's alleged coerced confession, even if taken as true, would not necessarily imply the invalidity of the Lattas' convictions.

Prosecutorial Immunity

The State Defendants argue that prosecutors Chapala and Duerring are entitled to absolute immunity from suit.  In response, Plaintiffs argue that absolute immunity is improper in this instance because Chapala stepped outside the shoes of a prosecutor and directed and

-19-

coordinated the investigation in the Latta case as head of the LaPorte County Homicide Unit, Duerring elicited false testimony from Walker when he told the jury that Herbert & Walker Labs was not getting paid for its services, and because absolute immunity does not apply to a claim for the withholding of exculpatory evidence.

Prosecutors are absolutely immune, both individually and in their official capacities, from liability under section 1983 for initiating a prosecution, and presenting the State's case. *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976). A civil claim against a prosecutor is absolutely barred if the prosecutor was performing functions "intimately associated with the judicial phase of the criminal process." *Id.* at 430. A prosecutor preparing for the initiation of judicial proceedings and for trial, which acts must include professional evaluation of the evidence assembled by police and the appropriate preparation for its presentation at trial, is entitled to absolute immunity. *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993).

This immunity is absolute and shields a prosecutor "even if he initiates charges maliciously, unreasonably, without probable cause, or even on the basis of false testimony or evidence." *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1238 (7th Cir. 1986). The immunity applies to a prosecutor's deliberate suppression of exculpatory evidence at trial. *Houston v. Partee*, 978 F.2d 362, 365 (7th Cir. 1992); *see also Spiegel v. Rabinovitz*, 121 F.3d 251, 257 (7th Cir. 1997) (finding absolute immunity shielded prosecutor who willfully

-20-

submitted incomplete and inadequate evaluation of case).  The immunity also applies to a prosecutor's evaluation of evidence in determining whether to prosecute.  *Davis v. Zirkelbach*, 149 F.3d 614, 617 (7th Cir. 1998); *Spiegel*, 121 F.3d at 257.

As the officials seeking absolute immunity, Chapala and Duerring bear the burden of showing immunity is justified for the functions in question.  *Burns v. Reed*, 500 U.S. 478, 486 (1991).  Plaintiffs argue that "Chapala stepped outside the shoes of a Prosecutor and directed and coordinated the investigation in the Latta case as the head of the LaPorte County Homicide Unit."  (Pls.' Mem. of Law in Opp. to State Defs.' Mot. for Summ. J., p. 70.)  Plaintiffs then proceed to list Chapala's alleged actions; however, Plaintiffs provide no citations to the record in support of this laundry list of alleged actions.

Additionally, the Court notes that in response to the 79 numbered paragraphs in the State Defendants' memorandum setting forth a "Statement of Material Undisputed Facts," Plaintiffs responded to, and disputed, only 9 of those paragraphs.  Plaintiffs do set forth 9 issues they claim are genuine issues which preclude summary judgment (such as "Defendants, Boyd and Sandberg, are not entitled to absolute immunity or qualified immunity"), but, as the Court in *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994), found, "this is a general statement of the contested issues in the case, akin to the statement required by Rule 28(a)(3) of the Federal Rules of Appellate Procedure.  But it certainly is not the kind of statement

-21-

that Local Rule 56.1 envisions." Plaintiffs then set forth, in rambling narrative fashion, 44 pages of background history. Plaintiffs' 44 pages contain citations to the record; however, Plaintiffs fail to satisfy the summary judgment requirements because they did not set forth in a "Statement of Genuine Issues" all material facts to which they contend exists a genuine issue necessary to be litigated. Ind. L.R. 56.1(a); *see also Waldridge*, 24 F.3d at 921-22, (citations omitted) (endorsing "the exacting obligation these [local] rules impose on a party contesting summary judgment to highlight which factual averments are in conflict as well as what record evidence there is to confirm the dispute, explaining that district courts are not obliged in our adversary system to scour the record looking for factual disputes and may adopt local rules reasonably designed to streamline the resolution of summary judgment motions."). In the interest of justice, the Court has attempted to parse through and consider whether the facts set forth in Plaintiffs' 44 pages of historical background and commentary set forth material facts to which Plaintiffs contend there exists a genuine issue necessary to be litigated, but the Court notes that this was quite burdensome (and unnecessarily so, because Plaintiffs should have followed the structure set forth by the summary judgment standard).

Nevertheless, having reviewed the record, this Court has determined that the actions taken by Chapala prior to the charges being filed were not prosecutorial, but rather more investigative, in

nature.   If  a  prosecutor's  function  was  administrative  or
investigatory,  he  is  only  entitled  to  qualified  immunity.   *See*
*Anderson v. Simon*,  217 F.3d 472, 475 (7th Cir. 2000).   In *Buckley v.*
*Fitzsimmons*,  509 U.S. 259, 273 (1993),  the Supreme Court found a
prosecutor who traveled to the crime scene to determine if evidence
was sufficiently reliable to constitute probable cause was not acting
as an advocate, but as an investigator.   "The absolute immunity of an
advocate is not confined strictly to actions taken in the courtroom,
and,  at  least  with  regard  to  prosecutors,  the  Supreme  Court  has
clearly indicated that absolute immunity may attach to some decisions
regarding obtaining, reviewing, and evaluating evidence."  *Auriemma*
*v. Montgomery*,  860 F.2d 273, 278 (7th Cir. 1988)  (internal citation
omitted).   However,  "[t]here  is  a  difference  between  the  advocate's
role in evaluating evidence and interviewing witnesses as he prepares
for trial, on the one hand, and the detective's role in searching for
the  clues  and  corroboration  that  might  give  him  probable  cause  to
recommend that a suspect be arrested, on the other hand."
*Buckley*, 509 U.S. at 273.

      To  the  extent  Chapala  met  with  other  individuals  during  the
investigation,  and  participated  and  to  some  degree  directed  the
investigation,  this  is  not  a  function  "intimately  associated  with  the
judicial phase of the criminal process."  *Imbler,* 424 U.S. at 430.
However,  Chapala  is  entitled  to  qualified  immunity  for  these
investigative or administrative actions.   *See Anderson*, 217 F.3d at

475.

Plaintiffs do not claim that Duerring participated in the investigation of the case, rather, they fault Duerring for allegedly withholding exculpatory evidence by not turning over the chromatograms relied upon by Craig Balliet in forming his expert opinion to Plaintiffs' criminal attorney.  They argue that Duerring committed a *Brady* violation by suppressing material evidence favorable to the Lattas.  Relying upon *Manning v. Miller*, 355 F.3d 1028, 1031 (7th Cir. 2004), Plaintiffs further contend that absolute immunity does not apply to a *Brady* claim.  However, *Manning* is inapposite.  That case did not involve prosecutors, but was a *Bivens* action against FBI agents.  The issue in *Manning* was how far immunity extends to FBI agents accused of "framing" the defendant.  The Seventh Circuit held that the plaintiff presented a viable *Brady* claim by alleging that FBI agents, as investigators, created false evidence, but did not disclose its falsity to prosecutors, and therefore the FBI agents did not have absolute immunity.

Here, it is undisputed that Duerring did not participate in the investigation of the case, but rather just the prosecution.  There is no claim that Duerring created false evidence.  Moreover, the alleged withholding of the chromatograms occurred after the prosecution had been initiated against the Lattas.  As cited by the State Defendants, there is a wealth of case law establishing that prosecutors cannot be held personally liable for the knowing suppression of exculpatory

information.  *See, e.g., Auriemma*, 860 F.2d at 279; *Heidelberg v. Hammer*, 577 F.2d 429, 432 (7th Cir. 1978) (finding prosecutor entitled to absolute immunity from charges that he destroyed and falsified a line-up report and police tapes); *Houston,* 978 F.2d at 365; *Douris v. Chweiker*, 229 F. Supp. 2d 391, 399 (E.D. Pa. 2002) (finding prosecutor's withholding of exculpatory evidence "is a quasi-judicial act protected by absolute immunity").

Also, it is undisputed that Duerring believed the chromatograms were actually inculpatory.  (Duerring Dep., p. 178.)  In *Carter v. Burch*, 34 F.3d 257, 262-63 (4th Cir. 1994), the Fourth Circuit determined that the decision on whether evidence was exculpatory involved a prosecutor's judicial rather than investigatory duties; therefore, the prosecutor was entitled to absolute immunity from section 1983 liability for failure to disclose allegedly material exculpatory evidence.  Thus, even assuming that Duerring did decide not to disclose the chromatograms to defense counsel, that decision was part of Duerring's judicial or quasi-judicial function as a prosecutor, and Duerring is entitled to absolute immunity for that action.


Boyd & Sandberg - Testimonial Immunity

The State Defendants argue that as witnesses, Boyd and Sandberg are entitled to absolute immunity from Plaintiffs' claim regarding their testimony during judicial proceedings.  Plaintiffs "do not argue

this point," but rather claim that the complained of actions are not the perjurious trial testimony of Boyd and Sandberg, but rather center around the acts of the investigation and interrogation.  (Pls.' Mem. of Law in Opp. to State Defs.' Mot. for Summ. J., p. 72.)  Because Plaintiffs have conceded this point, Boyd and Sandberg are entitled to absolute immunity from any claims premised upon their trial testimony.

Collateral Estoppel

The State Defendants argue that Plaintiffs' claims regarding the voluntariness of Jacqueline Latta's statements to Boyd are barred by the doctrine of collateral estoppel because the issues were all litigated and ruled upon in the trial and appellate courts of the State of Indiana.

However, the State Defendants fail to acknowledge applicable Seventh Circuit law which holds that "once a judgment is reversed it ceases to have collateral estoppel effect." *Salton, Inc. v. Philips Domestic Appliances and Personal Car B.V.*, 391 F.3d 871, 881 (7th Cir. 2004) (citing *Gosnell v. City of Troy, Ill.*, 59 F.3d 654, 657 (7th Cir. 1995) (stating "a remand deprives the judgment of preclusive effect until a new final judgment has been entered."); *Dodrill v. Ludt*, 764 F.2d 442, 444 (6th Cir. 1985) (reiterating that "the general rule is that a judgment which is vacated, for whatever reason, is deprived of its conclusive effect as collateral estoppel.")).

In this case, the Supreme Court of Indiana issued an order on March 16, 2001, in which it reversed the denial of post-conviction relief and remanded for a new trial. *Latta*, 743 N.E.2d at 1132. Although the Court based its ruling upon a finding of a conflict of interest from the joint representation, the case law is clear that if a judgment is reversed and remanded for any reason, the entire judgment loses its preclusive effect. *See Universal City Studios, Inc. v. Nintendo Co.*, 578 F. Supp. 911, 919 (S.D.N.Y. 1983) (finding no preclusive effect as to any issues where court of appeals vacated judgment). Therefore, because the Supreme Court of Indiana reversed the denial of post-conviction relief, collateral estoppel is inapplicable to this case.

<u>Boyd</u>

The State Defendants argue that Boyd did not violate any of Plaintiffs' constitutional rights. Plaintiffs contend that Boyd violated Jacqueline Latta's rights under the due process clause of the Fourteenth Amendment because her confession was involuntary, Boyd violated Jacqueline's Fifth Amendment right against self-incrimination, Jacqueline Latta was denied her *Miranda* rights, she was deprived of her right to counsel, and Boyd violated Plaintiffs' equal protection rights.

<u>Alleged Involuntary Confession</u>

This Court has already found that Plaintiffs' claim based upon an alleged coerced confession is barred by the statute of limitations. Even assuming, *arguendo*, that this claim was timely, it would still fail on the merits.

In arguing that Boyd deprived Plaintiffs of due process, Plaintiffs urge that Boyd's interrogation "deeply offends the values of our society and impugns and negatively reflects on the good officers who follow their motto of serve and protect." (Pls.' Mem. of Law in Opp. to State Defs.' Mot. for Summ. J., pp. 65-66.) Plaintiffs then outline a litany of actions (without referring to citations in the record or any case law), implying that taken together, Boyd's actions result in a deprivation of due process. Among other things, Plaintiffs claim that Boyd conducted the interrogations in an intimidating manner, he repeatedly accused Roger Latta of lying and setting the fire, he falsely advised Jacqueline Latta that the case was arson and that she set the fire, and he engaged in police trickery and other techniques to break down her will. Plaintiffs do not directly respond to the State Defendants arguments, who provide an analysis that Jacqueline Latta's statement was voluntary under the circumstances.

Under the due process clause, a court is to examine "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession" and "[take] into consideration the totality

-28-

of all the surrounding circumstances - both the circumstances of the accused and the details of the interrogation." *Dickerson v. United States*, 530 U.S. 428, 433 (2000) (quotation and citations omitted). A confession is voluntary "if the totality of the circumstances demonstrates that it is the product of a rational intellect and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics calculated to overcome the defendant's free will." *Watson v. DeTella*, 122 F.3d 450, 453 (7th Cir. 1997) (citing *United States v. Sablotny*, 21 F.3d 747, 750 (7th Cir. 1994); *Holland v. McGinnis*, 963 F.2d 1044, 1050 (7th Cir. 1992)). Factors to be considered include "the youth of the accused; his lack of education or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as deprivation of food or sleep." *Schenckloth v.Bustamonte*, 412 U.S. 218, 226 (1973).

The Seventh Circuit has held that "a law-enforcement agent may 'actively mislead' a defendant in order to obtain a confession, so long as a rational decision remains possible." *Conner v. McBride*, 375 F.3d 643, 653 (7th Cir. 2004) (quoting *United States v. Ceballos*, 302 F.3d 679, 695 (7th Cir. 2002)). In this case, the only statements alleged to be incriminating are: "I must have set the fire, but where did I start it at?" (Pls.' Ex.24, Boyd's Supplemental Report, p.4); "If I did start it, how come I don't remember doing it?"; if

Jacqueline Latta had burned the house, she was sorry that Brad died
(*Id.*); and that Jacqueline Latta had set the fire because she was
angry (*Id.*).  It is undisputed that although Jacqueline believed Boyd
talked to her in a threatening manner, Boyd did not physically
threaten her. (J. Latta Dep., pp. 186-87, 192, 196.)  Jacqueline
Latta's interview with Boyd lasted approximately one hour, which is
not an unreasonably long length of time. Plaintiffs point out that
Jacqueline was interrogated in succession by several officers, and
that she had already been giving a statement for approximately 2 hours
when Boyd entered the room.  However, by Jacqueline's own admissions,
to the best of her ability, she answered Boyd's questions truthfully
and voluntarily, she left the Sheriff's department by her own will,
and she felt she did not say anything incriminating. (J. Latta Dep.,
pp. 205-06.)

Plaintiffs still insist that Boyd's actions, taken together, were
not objectively legally reasonable. Upon review and consideration of
the record, and taking into consideration the totality of all the
surrounding circumstances, this Court believes that Jacqueline Latta's
statements to Boyd were made voluntarily. Boyd's actions as alleged
by Plaintiffs do not qualify as "evidence obtained by methods that are
so brutal and so offensive to human dignity that they shoc[k] the
conscience." *Chavez v. Martinez*, 538 U.S. 760 (2003) (Thomas, J.)
(citations and quotations omitted). Although Plaintiffs urge the Court
to apply the less stringent standard of deliberate indifference, the

-30-

cases cited in Plaintiffs' brief, *Johnson v. Herman*, 132 F. Supp. 2d 1130, 1139 (N.D. Ind. 2001), and *Armstrong v. Squadrito*, 152 F. 3d 564, 576-77 (7th Cir. 1998), are inapplicable. Those cases address prison situations where the courts applied the lower standard because the defendant officers had the ability to make unhurried judgments and had the chance for repeated reflection. The Supreme Court has applied the "shocks the conscience" standard, and this Court believes this is the applicable standard here. *Chavez*, 538 U.S. at 787.

As noted by the Seventh Circuit, "substantive due process is among the stingiest of constitutional protections, and the Supreme Court has limited relief to instances where law enforcement conduct violates 'fundamental fairness, shocking to the universal sense of justice.'" *Kramer v. Village of North Fond du Lac*, 384 F.3d 856, 865 (7th Cir. 2004) (quoting *United States v. Russell*, 411 U.S. 423, 431-32 (1973)). Although not dispositive, this Court notes that all of the previous state courts that considered this issue also determined that Jacqueline Latta's statement to Boyd was not coerced, but rather was voluntarily made.

### Right Against Self-Incrimination

Regarding the State Defendants' argument that Boyd did not violate Jacqueline Latta's right against self-incrimination, in response, Plaintiffs have solely argued that Boyd's alleged coercion of Jacqueline's statements resulted in a violation of her Fourteenth

Amendment right to substantive due process. Plaintiffs did not contend that Boyd's conduct violated the Fifth Amendment.

To the extent Plaintiffs still maintain a claim under the Fifth Amendment, it is not meritorious. First, undisputed evidence in the record shows that Jacqueline Latta was informed of her rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), by Officers Shott and Yadavia, and that Jacqueline Latta signed a waiver of those rights. (J. Latta Dep., pp. 177-78.)   Additionally, even if the State Defendants did fail to give Jacqueline Latta a *Miranda* warning, this does not entitle her to relief under section 1983. In *Thornton v. Buchmann*, 392 F.2d 870, 874 (7th Cir. 1968), the Seventh Circuit held that statements used to incriminate a plaintiff in violation of his or her *Miranda* rights against self-incrimination cannot form the basis for an independent civil claim under section 1983.  "The failure to give *Miranda* warnings would prevent the use of plaintiff's statements in his criminal trial, but plaintiff cannot make a claim for damages on the fact that defendants did not inform him of his *Miranda* rights." *Sapp v. Higgins*, No. 95 C 2612, 1996 WL 26877, at *2 (N.D. Ill. Jan. 22, 1996) (citing *Thornton*, 392 F.2d at 874).  As the Second Circuit has stated, "*Miranda* violations, absent coercion, do not rise to the level of constitutional violations actionable under § 1983. The appropriate remedy for violations of *Miranda* rights is exclusion of the evidence at trial." *Jocks v. Tavernier*, 316 F.3d 128, 138 (2d Cir. 2003) (citations omitted).   Plaintiffs have not claimed that

-32-

Jacqueline Latta was coerced by Boyd into waiving her rights, and there is no evidence in the record to support such a claim.

Finally, if Plaintiffs claim that Boyd violated Jacqueline Latta's Sixth Amendment right to counsel, the Court finds that this claim fails as well. In order to be entitled to a cessation of questioning until a lawyer has been made available, "[a] defendant must unambiguously request the assistance of counsel in order to invoke his right to an attorney under *Miranda* and thus prevent the interrogator from asking any further questions." *United States v. Muhammad*, 120 F.3d 688, 698 (7th Cir. 1997) (citing *Davis v. United States*, 512 U.S. 452, 458-60 (1994)). If a suspect requests counsel, but then makes statements or asks questions that "evinced willingness and a desire" for further discussion about the investigation, law enforcement may resume discussion with the suspect. *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983). Here, the undisputed facts show Jacqueline Latta did not make a clear, unambiguous request for an attorney. According to Boyd, Jacqueline never clearly indicated that she wanted an attorney. (Boyd Dep., p. 161.) After Jacqueline initiated the topic of an attorney, Boyd told Jacqueline that he would have to stop talking to her, and then Jacqueline grasped Boyd by the arms and told him she did not want Boyd to go, and she did not want an attorney. (J. Latta Dep., p. 260; Boyd Dep., p. 161.) As such, the evidence shows that Jacqueline wished to continue the interview or interrogation with Boyd, and did not clearly request an attorney.

-33-

<u>Plaintiffs' Equal Protection Rights</u>

In their complaint, Plaintiffs allege that Boyd violated their right to equal protection under the law. (Sec. Am. Compl., Count III, ¶ 29.) However, the complaint does not identify the classification that the equal protection claim is premised upon, and it is unclear what actions Plaintiffs claim are the basis for the alleged unequal treatment. Plaintiffs do not respond to the State Defendants' argument that they are entitled to summary judgment on the claims relating to violation of Plaintiffs' equal protection rights.

Assuming Plaintiffs have not waived this argument by failing to respond, the claim still fails. To succeed on a "class of one" equal protection claim, Plaintiffs "must demonstrate that the government is treating unequally those individuals who are prima facie identical in all relevant respects, and that the cause of the differential treatment is a totally illegitimate animus toward the plaintiff[s] by the defendant." *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (citations and quotations omitted). This is difficult to prove because "[i]ll will must be the sole cause of the complained-of action. A showing of uneven law enforcement standing along, will not suffice." *Id.* (quotations and citations omitted)

Plaintiffs have failed to put forth any evidence that Boyd or any of the State Defendants purposefully treated the Lattas differently or discriminated against them, or acted out an illegitimate animus.

-34-

Therefore, to the extent Plaintiffs maintain a claim of violation of Plaintiffs' equal protection rights, summary judgment is warranted in favor of the State Defendants.

<u>Failure to Record The Interrogation</u>

Plaintiffs allege that Boyd failed to record Jacqueline Latta's interrogation, in violation of the LaPorte County Sheriff's Department's protocol. (Sec. Am. Compl., Count III, ¶ 23.)  However, as pointed out by the State Defendants, this allegation fails to state a claim under section 1983.

Section 1983 allows recovery for violations of "rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983.  In this case, Plaintiffs have failed to set forth any argument, much less any supporting authority or supporting facts in the record, to show that the failure to record Jacqueline Latta's interrogation actually violated a right protected by the Constitution.  Section 1983 does not cover official conduct that violates only state law and regulations. *See Baker v. McCollan*, 443 U.S. 137, 144 (1979) (finding procedural violation claim did not give rise to a claim under the Constitution).  Therefore, the State Defendants are entitled to summary judgment on Plaintiffs claims relating to the failure to record Jacqueline Latta's statement.

Conspiracy

Plaintiffs allege that Boyd conspired with other defendants to wrongfully convict and imprison Plaintiffs to further his political career. (Sec. Am. Compl., Count III, ¶ 25.) The State Defendants argue that Plaintiffs have not produced sufficient evidence that a conspiracy existed, or that Boyd was a part of the conspiracy. Plaintiffs have set forth no objective evidence tending to show that a conspiracy existed. "Where the party opposing a motion for summary judgment will bear the burden of proof on an issue at trial, he must go beyond the pleadings and affirmatively establish a genuine issue of material fact." *Bratton v. Roadway Package Sys., Inc.*, 77 F.3d 168, 173 (7th Cir. 1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

A civil conspiracy requires an agreement between two or more persons to inflict an injury on another. *Amundsen v. Chicago Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000). To state a conspiracy claim under section 1983, a plaintiff must show (1) "an express or implied agreement among defendants to deprive plaintiff of his or her constitutional rights," and (2) "actual deprivations of those rights in the form of overt acts in furtherance of the agreement." *Neff v. Hmurovich*, 261 F. Supp. 2d 1026, 1045 (S.D. Ind. 2003) (quoting *Scherer v. Balkema*, 840 F.2d 437, 441 (7th Cir. 1988)). "[A] conspiracy claim cannot survive summary judgment if the allegations are vague, conclusionary, and include no overt acts reasonably related

-36-

to the promotion of the alleged conspiracy." *Amundsen*, 218 F.3d at 718 (quotation omitted).  Plaintiffs' conspiracy claim against Boyd fails because they have not provided any evidence that Boyd  had an agreement with other defendants to cause such alleged  constitutional deprivations.

Additionally, because Plaintiffs have failed to show that they were deprived of any constitutional right, they cannot recover on a conspiracy claim.  *See Cefalu v. Vill. of Elk Grove*, 211 F.3d 416, 423 (7th Cir. 2000) (citations and quotation omitted) ("there is no constitutional violation in conspiring to cover-up an action which does not itself violate the Constitution . . . . The jury's conclusion that [Plaintiffs] suffered no constitutional injury thus forecloses relief on the conspiracy claim.").  Summary judgment is therefore properly granted against Plaintiffs on their claim for conspiracy.

Sandberg

Plaintiffs have essentially alleged that Sandberg failed to fully and properly investigate the fire, he failed to preserve evidence, and that he withheld exculpatory evidence. (Sec. Am. Compl., Count IV.) The State Defendants argue that Plaintiffs have presented no evidence whatsoever to support these bald accusations.

During their depositions, the Lattas testified that they had no evidence that Sandberg poorly investigated the fire, but that  this opinion was based upon their own beliefs that the fire was accidental.

-37-

(J. Latta Dep. pp. 245-47; R. Latta Dep., vol. 1, pp. 196-97.) In reviewing the record, it is clear that Plaintiffs have presented no evidence Sandberg acted in bad faith or that any of his actions "shock the conscience" as to violate substantive due process. In their reply memorandum, the State Defendants set forth Sandberg's role in the investigation, including citations to the record. From this evidence, it is obvious that Sandberg and the rest of the cause and origin investigation team did consider other sources of the fire, such as the furnace and space heater, but during the investigation, ruled out the furnace and space heater as sources of the fire. Sandberg testified that the physical indicators at the scene, including the burn patterns on the floor and the elimination of accidental causes led him to the opinion that the Latta fire was arson. (Sandberg Dep., pp. 87-88.) Although Plaintiffs make much of the fact that Sandberg and the other defendants had worked together in the past and were friends, there is nothing about these relationships, in and of themselves, that would cause Sandberg to be biased and to intentionally discriminate against Plaintiffs during the investigation.

Finally, as with Boyd, Plaintiffs have put forth no argument or evidence to support an equal protection claim against Sandberg. They have not shown that Sandberg was driven by any spite or animus against Plaintiffs which tainted Sandberg's investigation. Because Sandberg did not violate any of Plaintiffs' constitutional rights, the State Defendants are entitled to summary judgment on Plaintiffs' 1983 claim

against Sandberg.

Conspiracy

As with Boyd, Plaintiffs also claim that Sandberg conspired with other defendants to determine that the fire was the result of arson, and to convict the Lattas for arson. (Sec. Am. Compl., Count IV, ¶¶ 26, 28.) Again, this claim fails because Plaintiffs have not shown that Sandberg had an agreement with other defendants to improperly investigate the case or wrongfully convict the Lattas. Moreover, because Plaintiffs have failed to show that they were deprived on any constitutional right, they cannot recover on this type of conspiracy claim. *Cefalu*, 211 F.3d at 423.

CONCLUSION

For the reasons set forth above, the State Defendants' Motion for Summary Judgment [DE #192], is **GRANTED.** The Clerk is **ORDERED** to **DISMISS WITH PREJUDICE** Plaintiffs' claims against Defendants, Walter Chapala, Scott Duerring, the LaPorte County Prosecutor's Office, Arland Boyd, the Indiana State Police, Bradley Sandberg, and the Indiana State Fire Marshals Office.

**DATED:  October 25, 2005**        **/s/RUDY LOZANO, Judge**
                                    **United States District Court**